IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CHARLIE NATTIEL,

      Plaintiff,

v.                                              CASE NO. 1:15-cv-150-WTH-GRJ

TOMLINSON, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on ECF No. 70, Defendant Florida
Department of Corrections' Motion to Dismiss. Plaintiff has filed a response
and supplemental response in opposition. (ECF Nos. 71, 90.) The motion
to dismiss is therefore ripe for review. For the reasons explained below, it
is respectfully recommended that Defendant Florida Department of
Corrections' motion to dismiss should be denied.

## I.  BACKGROUND

Plaintiff, an inmate in the custody of the Florida Department of
Corrections ("FDOC") at Desoto Annex, initiated this case by filing a *pro se*
complaint pursuant to 42 U.S.C. § 1983. (ECF No. 1.) Plaintiff
subsequently obtained counsel and amended his complaint bringing claims

against seven Defendants, including the FDOC. (ECF No. 63.)

Plaintiff's claims arise from an alleged use of chemical agents on August 24, 2013. In his third amended complaint, Plaintiff claims Defendant FDOC ("FDOC"), through its agents and employees, violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., for intentionally failing to provide Plaintiff with reasonable accommodations pertaining to the use of chemical agents in light of Plaintiff's asthma and partial blindness. (*Id.* at 11–16.)

Specifically, Plaintiff alleges that he has chronic asthma and is partially blind with one prosthetic eye. His asthma substantially limits major life activities, including breathing. His partial blindness also substantially limits major life activities, including sight and mobility. Plaintiff says he is disabled under the ADA.

Plaintiff alleges that FDOC prisons are facilities, whose operation comprises a program and service for purposes of Title II of the ADA. Despite Plaintiff's disabilities, however, the FDOC and its agents never assessed whether Plaintiff is disabled. The FDOC also never designated Plaintiff as being contraindicated for the use of chemical agents, despite knowing of his disabilities. Chemical irritants trigger asthma. Pepper spray

causes both temporary eye pain and damage, and in some cases, permanent eye damage to the cornea or complete loss of sight.

On August 24, 2013, Nurse Tomlinson sought permission from the physician in charge to authorize the use of chemical agents on Plaintiff. Captain Lott thereafter sprayed Plaintiff with chemical agents. Plaintiff says he was sprayed with an entire canister of the chemical agent.

Plaintiff claims there are categorical exceptions for the non-spontaneous use of chemical agents on inmates suffering from disabilities and other medical conditions. Thus, feasible alternatives and accommodations exist to address inmate misbehavior that will not pose a risk of harm to asthmatic inmates. Examples of such alternatives include electronic immobilization devices, cell extractions, and rubber ball rounds. Plaintiff alleges, however, that the FDOC never implemented a categorical exception for asthmatic or partially blind inmates.

Plaintiff says although his need for a reasonable accommodation was known and obvious, the FDOC and its agents and employees acted intentionally and/or with deliberate indifference to Plaintiff's need for a reasonable accommodation, including: (1) spraying Plaintiff with chemical agents, despite knowing of his disabilities; (2) failing and refusing to establish policies and procedures whereby inmates identified as asthmatic

and/or partially blind are designated as being contraindicated for the use of chemical agents; (3) failing and refusing to train its agents and employees regarding the FDOC's obligation to provide asthmatic and partially blind inmates with reasonable accommodations for their disabilities; (4) failing and refusing to consider Plaintiff's particular disabilities when determining the type of non-spontaneous use of force to use upon him; (5) failing and refusing to investigate what accommodations for Plaintiff would have been; and (6) failing and refusing to reasonably accommodate Plaintiff's disability.

Use of chemical agents on Plaintiff subjected him to a substantial risk of injury and possible death because of his disabilities. This risk was not faced by other inmates and could have been avoided by a reasonable accommodation. As a result of the FDOC's failure to provide Plaintiff with a reasonable accommodation Plaintiff alleges he suffered excruciating pain, inability to breath, choking, permanent vision impairment to his one remaining eye, and mental suffering and anguish. Plaintiff seeks: (1) nominal, compensatory, and punitive damages; (2) a declaratory judgment ordering the FDOC to (a) evaluate Plaintiff for ADA disability status, (b) make a reasonable accommodation for the use of chemical agents as to Plaintiff, and (c) create a policy to exempt asthmatic, partially blind, and

blind inmates with ADA disability status from discipline by use of chemical agents; (3) an injunction ordering the FDOC to cease and desist using chemical agents on Plaintiff and on asthmatic and/or blind and partially blind inmates; and (4) attorneys' fees and costs.

## II.  STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level," and the complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555. Conclusory allegations that "amount to nothing more than a formulaic recitation of the elements of a cause of action" are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. To escape dismissal, a complaint must allege facts sufficient to move claims "across the line from conceivable to plausible." *Id.* at 683 (quoting *Twombly*, 550 U.S. at 570)). "The plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Franklin v. Curry*, 738

F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "The complaint's allegations must establish 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## III.  DISCUSSION

The FDOC requests that the Court dismiss the claim against the FDOC because Plaintiff failed to properly exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA") prior to filing suit and because Plaintiff fails to state a cause of action against the FDOC. (ECF No. 70.)

## A.  Exhaustion under the PLRA

The PLRA requires a prisoner to exhaust all available administrative remedies before filing an action in federal court challenging prison conditions. "This requirement is a 'pre-condition to suit' that must be enforced even if the available administrative remedies are 'futile or inadequate.'" *Logue v. Pearson,* No. CV410-240, 2011 U.S. Dist. LEXIS 66950, at *2–3 (S.D. Ga. 2011) (citing *Harris v. Garner,* 190 F.3d 1279, 1285–86 (11th Cir. 2005)). Exhaustion is mandatory under the PLRA, and unexhausted claims are not permitted. *Jones v. Bock,* 549 U.S. 199, 211 (2002). Exhaustion serves two main purposes. First, exhaustion protects administrative agency authority by giving the agency an opportunity to

correct its own mistakes before being haled into federal court and discouraging disregard of the agency's procedures. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (citations omitted). Second, exhaustion promotes efficiency because claims can be resolved much more quickly and economically in agency proceedings than in federal litigation. *Id.*

The PLRA's exhaustion requirement contains a procedural default component; prisoners must comply with the applicable deadlines, or good-cause standards for failure to comply, contained in the administrative grievance procedures. *Johnson v. Meadows*, 418 F.3d 1152, 1158 (11th Cir. 2005). "'[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies, and thus is foreclosed by § 1997e(a) from litigating. . . . [T]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require.'" *Id*. (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024–25 (7th Cir. 2002)).

To exhaust administrative remedies in Florida, a prisoner in FDOC custody must complete the administrative review process established under regulations promulgated by the Secretary of the FDOC. Fla. Stat. Ann. § 944.09(1)(d) ("The department has authority to adopt rules ... to implement its statutory authority. The rules must include rules relating to ...

[g]rievance procedures which shall conform to 42 U.S.C. § 1997e."). Under the administrative review process established by the Secretary of the FDOC, a prisoner must: (1) file an informal grievance with a designated prison staff member, (2) file a formal grievance with the warden's office, and then (3) submit an appeal to the Secretary of the FDOC. *Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004) (citing Fla. Admin. Code Ann. §§ 33-103.001–103.019*).* Once a prisoner has completed this process, he has properly exhausted his administrative remedies. *Id.*

In the Eleventh Circuit, the defense of failure to exhaust under the PLRA is considered a matter in abatement under Fed. R. Civ. P. 12 and, thus, is treated like a defense of lack of jurisdiction. *Bryant v. Rich*, 530 F.3d 1368, 1374, 1376 (11th Cir. 2008.) Accordingly, "[a] district court may properly consider facts outside of the pleadings to resolve a factual dispute regarding exhaustion where the factual dispute does not decide the merits and the parties have a sufficient opportunity to develop the record." *Singleton v. Dep't of Corr.*, 323 F. App'x 783, 785 (11th Cir. 2009). Deciding a motion to dismiss for failure to exhaust administrative remedies requires a two-step process as established in *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). The Court first "looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response,

and if they conflict, take plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* at 1082; *Whatley v. Warden*, 802 F.3d 1205, 1211–12 (11th Cir. 2015) (at first *Turner* step, district court must accept plaintiff's facts as true "and make the exhaustion determination on [plaintiff's] view of facts;" appellate review of results of first step is *de novo*). If the complaint is not subject to dismissal through the first step, the Court "proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." *Turner*, 541 F.3d at 1082; *Whatley*, 802 F.3d at 1213 (defendants' contention that plaintiff's exhibits were fabricated created a factual dispute that required explicit findings under the second *Turner* step; such findings are subject to review on appeal for clear error).[1] *Turner* also established, however, that an inmate is not required to grieve a "breakdown in the grievance process" because the PLRA only requires that a prisoner exhaust his "available administrative remedies." *Id.* at 1083–84

---

[1] In *Whatley*, the Eleventh Circuit reversed the dismissal of a complaint for failure to exhaust because the record did not reflect whether the district court dismissed the case on the first or second step of *Turner*, and thus, the Court could not evaluate whether the district court's conclusions should be reviewed under the *de novo* standard of the first *Turner* step or the "clear error" standard of the second *Turner* step. 802 F.3d at 1213. 6.

("[I]t is possible for retaliation or the threat of retaliation to make administrative remedies unavailable to an inmate.").

The FDOC's motion to dismiss for failure to exhaust administrative remedies is due to be denied. Applying the requisite *Turner* analysis here, the factual allegations regarding Plaintiff's grievances in the FDOC's motion to dismiss do not conflict with Plaintiff's response. The FDOC submitted the following materials in support of its exhaustion argument: (1) a declaration made under penalty of perjury by Alan McManus, the Bureau Chief of Policy Management and Inmate Appeals for the FDOC (ECF No. 70-1 ("McManus Dec.")); and (2) a declaration made under penalty of perjury by Evelyn Garst, the ADA Coordinator for the FDOC, regarding Plaintiff's ADA accommodation requests (ECF No. 70-2 ("Garst Dec.")). According to Mr. McManus, Plaintiff did not file any grievances or appeals from 2011 through July 2013 related to requested ADA accommodations. (McManus Dec. ¶ 3.)[2] Similarly, Ms. Garst represents that Plaintiff never submitted a request for ADA accommodations to the FDOC. (Garst Dec. ¶ 4.)[3] Consequently, the FDOC argues that it never reviewed Plaintiff for any

---

[2] Plaintiff concedes this point in his supplemental response. (ECF No. 90 at 2.)

[3] According to Ms. Garst, ADA Coordinator for the FDOC, the FDOC utilizes a system of impairment ratings to identify inmates with physical difficulties, and rates inmates with physical, hearing and vision

type of accommodation under the ADA. (*Id.*) The declarations, however, say nothing about whether Plaintiff exhausted his ADA claim via the grievance process following the alleged ADA violation—i.e., the application of chemical agents—before filing suit in federal court.

The problem with the FDOC's argument is that it conflates the ADA with the PLRA. Properly making a request for accommodation under the ADA is not one of the steps necessary for an inmate to properly exhaust his administrative remedies under the Florida Administrative Code. *See Betancourt v. Fla. Dep't of Corr.*, No. 3:13-cv-00284-J-20JRK, 2014 WL 10742621, at *5 (M.D. Fla. Dec. 1, 2014) (denying defendants' argument

---

impairments, as well as those with developmental disabilities. Based on the impairment rating, inmates may require housing at certain facilities designed to accommodate their impairment, such as a prison designed to accommodate wheelchairs. In order to determine whether such accommodations are required, an inmate must submit an accommodation request and grieve the issue through the prison grievance system. If an inmate makes a request for accommodation, medical information is provided to the ADA Coordinator in order to make the determination whether that particular inmate is a qualified person with a disability under the ADA, and whether a particular accommodation is needed.

(Garst Dec. ¶¶ 1, 3.)

Ms. Garst avers that Plaintiff never filed a DC2-530 Reasonable Modification or Accommodation Request form regarding the issues set forth in his Complaint. (*Id.* ¶ 4.) Thus, the FDOC never reviewed Plaintiff for any type of accommodation based on his issues. (*Id.*) If Plaintiff had submitted a DC2-530 form regarding his requested accommodation, Ms. Garst would have referred Plaintiff to medical so a doctor could review whether Plaintiff had any medical issues which would be adversely affected by the use of chemical agents. (*Id.* ¶ 5.) Plaintiff concedes that he never filed a request for an ADA accommodation prior to August 23, 2013. (ECF No. 90 at 2.)

that plaintiff failed to exhaust his administrative remedies regarding the

alleged ADA violation because although plaintiff did not file a request for

accommodation on form DC2-530, the request for accommodation is not a

requirement under the grievance procedure). Whether Plaintiff went

through the appropriate process *before* the use of chemical agents to

determine whether he is a qualified person with a disability under the ADA

and therefore qualifies for some type of special accommodation (i.e., not

being sprayed with chemical agents) may be relevant to his ADA claim but

does not constitute a failure to exhaust defense under the PLRA.[4]

    The proper PLRA exhaustion inquiry is whether Plaintiff exhausted

his claim that the FDOC violated his rights under the ADA before filing suit

---

[4] The FDOC argues that "in the case of requesting an ADA accommodation while in custody of Defendant, additional administrative filings are required to be considered for an accommodation." (ECF No. 70 at 9) (citing Fla. Admin. Code 33-210.201). Further, the FDOC argues that "the ADA Accommodation Request Procedure is a process which is required to be exhausted in order to claim that an accommodation should be provided to an inmate based on the ADA." (*Id.*) The FDOC, however, provides no authority for the proposition that an ADA claim is not properly exhausted under the PLRA unless the plaintiff followed the ADA Accommodation Request Procedure. Notably, Rule 33-210.201, which sets forth the ADA provisions for inmates (including the filing of a Reasonable Modification or Accommodation Request Form when requesting an accommodation or modification), states: "Complaints and Accommodation Appeals. Inmates who have a complaint alleging a violation of the Americans with Disabilities Act *or* who want to appeal the denial of a request for accommodation *shall follow the guidelines set forth in Chapter 33-103, F.A.C. [(the administrative review process)]*." Fla. Admin. Code. 33-210.201(5) (emphasis added). This provision suggests that an inmate can properly grieve an alleged ADA violation even though the inmate did not ever submit a Reasonable Modification or Accommodation Request Form.

in federal court. In his response, Plaintiff provided copies of various grievances filed after the alleged ADA violation. (ECF No. 71-1, 71-2, 71-3, 71-4, 71-5, 71-8.)[5] On August 27, 2013, Plaintiff filed a formal grievance to the warden and an emergency grievance to the Secretary of the FDOC requesting a personal interview regarding alleged abuse by an officer and use of chemical agents on August 24, 2013, and subsequent medical complaints. (ECF Nos. 71-1 at 1; 71-2 at 1.) Both his formal grievance and his emergency grievance assert he has asthma and his medical jacket indicates he is not supposed to be sprayed with chemical agents. (*Id.*)

The assistant warden responded to Plaintiff's formal grievance on September 4, 2013, advising that Plaintiff's allegations regarding the assault would be reported to the Inspector General's office for review and his medical complaints would be forwarded to the medical department for follow-up. (ECF No. 71-1 at 2.) But because the basis of Plaintiff's formal grievance appeared to be for a personal interview with the warden, Plaintiff's grievance was denied. (*Id.*)

A representative for the Secretary then responded to Plaintiff's emergency grievance on September 9, 2013. (ECF No. 71-2 at 2.) The representative denied Plaintiff's grievance because the subject of Plaintiff's

---

[5] The FDOC does not challenge those grievances.

grievance was currently being reviewed by the investigative section of the Office of the Inspector General. (*Id.*)

Both of these grievances satisfy Plaintiff's obligation to exhaust administrative remedies under the PLRA. Plaintiff asserts in his grievances that he was sprayed with chemical agents even though his medical file says he is not supposed to be sprayed with chemical agents due to his medical conditions. Although his grievances do not specifically mention the ADA, the purpose of a grievance is to alert the administrators to a specific issue so that it may be investigated and resolved if possible. Plaintiff's assertions that he was sprayed with chemical agents even though his file said he was not supposed to be sprayed due to his medical conditions was sufficient to put the FDOC on notice of the general basis of Plaintiff's ADA claim.

Furthermore, because Plaintiff's allegations were referred to the Office of the Inspector General for investigation, Plaintiff had no further avenue for recourse. Plaintiff therefore properly exhausted his ADA claim. *See Espinal v. Young*, No. 4:13cv116–RH/CAS, 2015 WL 5353005, at *2–5 (N.D. Fla. Aug. 19, 2015) (complaint referred to the Office of the Inspector General and response to grievance appeal stating "[a]s action has been initiated, you may consider your appeal approved from that

standpoint," constituted proper exhaustion because department could investigate the attack and evaluate the officers' actions); *Lanier v. Smith*, No. 3:08–cv–833–J–12JRK, 2009 WL 1758904, at *1 (M.D. Fla. June 19, 2009) (denying defendants' motion to dismiss for failure to exhaust where plaintiff was informed three times that the matter had been referred to the Inspector General's Office for review and consideration). Accordingly, to the extent the FDOC seeks dismissal of Plaintiff's claims for failure to exhaust, the motion is due to be denied.

### B.  ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entitty, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. It is well settled that Title II of the ADA applies to inmates in state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209, 213 (1998).

"In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by

the public entity; and (3) that the exclusion, denial of benefit, or

discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-*

*Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

Plaintiff has plausibly alleged that he is a qualified individual with a

disability. Under the ADA, a "qualified individual with a disability" is

> an individual with a disability who, with or without reasonable
> modifications to rules, policies, or practices, the removal of
> architectural, communication, or transportation barriers, or the
> provision of auxiliary aids and services, meets the essential
> eligibility requirements for the receipt of services or the
> participation in programs or activities provided by a public
> entity.

42 U.S.C. § 12131(2). For purposes of the ADA, a disability is: "(A) a

physical or mental impairment that substantially limits one or more of the

major life activities of [an] individual; (B) a record of such an impairment; or

(C) being regarded as having such an impairment . . . ." 42 U.S.C. §

12102(1). Major life activities include, but are not limited to, seeing and

breathing. § 12102(2)(A).

"A physical impairment, standing alone . . . is not necessarily a

disability as contemplated by the ADA." *Gordon v. E.L. Hamm & Assoc.,*

*Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Instead, to determine whether an

impairment substantially limits a major life activity courts consider: "(1) the

nature and severity of the impairment; (2) the duration or expected duration

of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.*

Plaintiff alleges that he has chronic asthma and is partially blind with one prosthetic eye. He says these impairments substantially limit his ability to breath and see. Based on these allegations, it is plausible that Plaintiff is a qualified individual with a disability under the ADA. Plaintiff goes beyond merely alleging that he is a qualified individual with a disability. And although the FDOC argues that Plaintiff fails to demonstrate how any of his alleged disabilities substantially limit a major life activity, whether his asthma and partial blindness in fact substantially limit his ability to breath and see is not a proper matter to determine at the motion to dismiss stage.

Plaintiff has also plausibly alleged that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity. The final clause in § 13132 provides that "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such [public] entity." § 13132. In the Eleventh Circuit, "the final clause of § 13132 'protects qualified individuals with a disability from being 'subjected to discrimination by any such entity,'

and is not tied directly to the 'services, programs, or activities' of the public entity.'" *Bircoll*, 480 F.3d at 1085 (quoting *Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*, 133 F.3d 816, 821–22 (11th Cir. 1998)). The final clause "is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Id.* (quoting *Bledsoe*, 133 F.3d at 822) (internal quotations omitted).[6]

Plaintiff has not alleged that he was denied the benefits of a public entity's "services, programs, or activities" in the traditional sense. *See, e.g.*, *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("A [courthouse] trial undoubtably is a service, program, or activity within the meaning of § 12132."); *Crawford*, 115 F.3d at 483 (noting that a prison's education program is a "program" under the ADA and the use of a library or dining

---

[6] This interpretation is consistent with the Supreme Court's discussion regarding—without deciding—whether § 12132 applies to an arrest:

> The argument that San Francisco now advances is predicated on the proposition that the ADA governs the manner in which a qualified individual with a disability is arrested. The relevant provision provides that a public entity may not "exclud[e]" a qualified individual with a disability from "participat[ing] in," and may not "den[y]" that individual the "benefits of[,] the services, programs, or activities of a public entity." § 12132. This language would apply to an arrest if an arrest is an "activity" in which the arrestee "participat[es]" or from which the arrestee may "benefi[t]." This same provision also commands that "no qualified individual with a disability shall be ... subjected to discrimination by any [public] entity." Ibid. This part of the statute would apply to an arrest if the failure to arrest an individual with a mental disability in a manner that reasonably accommodates that disability constitutes "discrimination." Ibid.

*City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1773 (2015)

hall constitutes an "activity" under the ADA).  But whether or not the non-spontaneous use of chemical agents by FDOC officials in a safe manner to maintain order within the prison is a "service" or "activity" for ADA purposes,[7] Plaintiff has nonetheless plausibly alleged under the final

_____

[7] Plaintiff says categorical exceptions exist for the non-spontaneous use of chemical agents on inmates suffering from other disabilities and medical conditions. He seeks to be treated fairly—with his disabilities in mind—pertaining to the non-spontaneous use of chemical agents. In this sense, the non-spontaneous use of chemical agents by FDOC officials in a safe manner could be the "service" of which Plaintiff was allegedly denied the benefit. *See Gorman v. Bartch*, 152 F.3d 907, 912–13 (8th Cir. 1998) (transportation of an arrestee to the police station is a service of the police within the meaning of the ADA whereby the benefit the arrestee sought was to be handled and transported in a safe and appropriate manner consistent with his disability).

For example, in *Fame v. City of Arlington*, 657 F.3d 215, 226–27 (5th Cir. 2011), the Fifth Circuit concluded that "[b]uilding and altering city sidewalks unambiguously are 'services' of a public entity under any reasonable understanding of that term." The court noted the Supreme Court's broad understanding of "a 'service' to mean 'the performance of work commanded or paid for by another,' or 'an act done for the benefit or at the command of another.'" *Id.* at 226 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)). The court further explained that in accordance with the dictionary definition, "[a] 'service' also might be defined as 'the duties, work, or business performed or discharged by a public official.'" *Id.* (citing Webster's Third New International Dictionary 2075 (1993)). Thus, a prison official's actions undertaken to maintain order within a prison—such as utilizing chemical agents to regain an inmate's compliance—could arguably be considered a service of a public entity.

The Court does not suggest, however, that a prison and/or incarceration in and of itself is a "program" or "service" for purposes of Title II of the ADA. Although a prison is subject to the ADA, "[i]ncarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access . . . ." *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997), *abrogated on other grounds by Erickson v. Bd. of Governors of State Colleges & Univs. for Ne. Ill. Univ.*, 207 F.3d 945 (7th Cir. 2000) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). A public facility is distinguishable from a public entity's services, programs, or activities. *See Shotz*, 256 F.3d at 1080 (distinguishing between facilities and services by explaining that a public entity may comply with the ADA by relocating its services, programs, and activities from an inaccessible facility to an accessible facility); *Babcock v. Michigan*, 812 F.3d 531, 536 (6th Cir. 2016) (concluding "that facility accessibility is not, standing alone, a cognizable claim under Title II's private right of action; rather, the inquiry is tied to whether that

clause in § 13132 that the FDOC failed to reasonably accommodate his disability. *See City & Cty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1773 (2015)* (the final clause of § 13132 "would apply to an arrest if the failure to arrest an individual with a mental disability in a manner that reasonably accommodates that disability constitutes "discrimination"); *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 992 (11th Cir. 2015) ("An ADA claim may proceed on the theory that the Defendant failed to reasonably accommodate the Plaintiff's disability.").

Plaintiff says the FDOC failed to subject him to non-spontaneous use-of-force in a manner that reasonably accommodates his asthma and partial blindness. If that failure constitutes discrimination, the final clause of § 13132 would apply. Plaintiff says that failure was "discrimination" because he was treated differently than other inmates with other medical conditions (as well as the general population), despite the accommodation exceptions that exist for medical conditions. Accordingly, Plaintiff has sufficiently alleged that the FDOC discriminated against him under §

---

facility's inaccessibility interferes with access to public services, programs, or activities"); *Layton v. Elder*, 143 F.3d 469, 473 (8th Cir. 1998) (distinguishing between a courthouse and the services, programs, and activities administered therein).

13132.[8]

Finally, Plaintiff has also plausibly alleged that the exclusion, denial of benefit, or discrimination was by reason of his disability. "[T]he ADA requires only the lesser 'but for' standard of causation . . . ." *Schwarz v. City of Treasure Island*, 544, F.3d 1201, 1212 n.6 (11th Cir. 2008) (citing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073–74 (11th Cir. 1996)). Plaintiff says he is not the same as every other inmate because he has chronic asthma and is partially blind. He claims he was subjected to a substantial risk of injury that other inmates were not because the FDOC failed to provide him with a reasonable accommodation for the use of non-spontaneous use-of-force. In other words, Plaintiff says the FDOC treated

---

[8] Plaintiff alleges that Nurse Tomlinson sought permission from the doctor to authorize use of chemical agents on Plaintiff and that Captain Lott thereafter sprayed Plaintiff with chemical agents. (ECF No. 63 at 9 ¶¶ 48–49.) Plaintiff does not allege, however, whether the doctor gave such authorization and/or any type of special accommodation in light of Plaintiff's asthma and partial blindness. *Cf. Lonergan*, 623 F. App'x at 994 (allegation that prison failed to give plaintiff the treatment prescribed by his dermatologist (to stay out of the sun) and instead prescribed an alternative remedy (sun block, a hat, and log sleeves) was sufficient to plead a prima facie ADA claim). The Court notes that Plaintiff filed various items (other than grievances) in response to the FDOC's motion to dismiss, including Plaintiff's medical records and an Inspector General's Report. (ECF Nos. 71–6, 71–7.) These documents suggest the FDOC followed the special treatment prescribed by the doctor in utilizing non-spontaneous use-of-force on Plaintiff. Nevertheless, the Court may not consider those documents in deciding a motion to dismiss because they were not attached to or incorporated by reference in the complaint. But, in the event the evidence ultimately demonstrates that Plaintiff merely disagrees with treatment prescribed by his doctor pertaining to whether Plaintiff could be sprayed with chemical agents, it is unlikely that Plaintiff could establish an ADA violation.

him differently (worse) by reason of his chronic asthma and partial

blindness. This suggests that the alleged discrimination in this case was by

reason of Plaintiff's disabilities. *Cf. Bryant v. Madigan*, 84 F.3d 246, 249

(7th Cir. 1996) (ADA did not apply to prisoner's claim that prison failed to

attend to prisoner's medical needs as a paraplegic because prisoner

merely claimed he was not given special treatment as a paraplegic and did

not allege that he was treated worse because of his disability or excluded

from some prison service, program, or activity because he was disabled).

Accordingly, the Court concludes that Plaintiff has plausibly stated an ADA

claim.

## V.  RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

Defendant's Motion to Dismiss, ECF No. 70, should be denied.

**IN CHAMBERS** at Gainesville, Florida, this 13th day of July 2017.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**